**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**RAYSHAWN RANKIN,**

**Plaintiff,**

**v.**

**COULTER VENTURES, LLC, et al.,**

**Defendants.**

**Case No. 2:25-cv-1334**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Jolson**

**OPINION AND ORDER**

Plaintiff Rayshawn Rankin briefly worked for Rogue Fitness, which is the public-facing name of defendant Coulter Ventures. Rankin was injured during that employment, which limited the kind of work he could perform. Proceeding pro se, he sued Rogue. Rankin claims that, in addition to refusing to honor those restrictions, the company denied him certain employment benefits, retaliated against him for lawful requests, and ultimately fired him because of his disability. (Am. Compl., Doc. 14). Rogue now moves for summary judgment on all of Rankin's claims. (Doc. 23). But Rogues does not attack the merits of those claims, so much as their procedural shortcomings. According to Rogue, four of the five live claims fail because Rankin did not sue within ninety days of receiving his EEOC right-to-sue notice. (Doc. 23, #113–16). And Rogue says the remaining claim, interference with benefits, fails because Rankin never timely elected to participate in Rogue's benefits programs in the first place. (*Id.* at #117). For the reasons explained below, the Court **DENIES** Rogue's Motion for Summary Judgment (Doc. 23).

## BACKGROUND

Befitting the procedural nature of Rogue's motion, the matter comes before the Court on a limited record. Beyond the pleadings, the parties rely only on a few exhibits, none of which address the actual facts underlying the matter, but instead focus on things such as the timing of the EEOC notice. (*See* Doc. 23; Plf.'s Resp., Doc. 24). So the Court reports the factual background based on Rankin's allegations (Doc. 14) and Rogue's answer (Doc. 20), but with the understanding that the recited "facts" are offered only for background; they are not evidentiary facts on which the Court intends to rely, except as specifically noted.

Rogue hired Rankin on August 13, 2024, to perform "manufacturing and quality control duties" on Rogue's production floor. (Doc. 14, #67; Doc. 20, #97). Rankin did not get off to a good start. On August 23, just ten days after he started, Rankin was injured on the job. (Doc. 14, #68). In particular, he hurt his left hand, thumb, and wrist. (*Id.*). That Rankin is a southpaw only made matters worse. (*Id.*).

Promptly after his injury, Rankin sought medical treatment through Rogue's workers' compensation program. (*Id.*). Rankin alleges that the physicians who treated him imposed various work restrictions, (*id.*), and Rogue admits that fact, (Doc. 20, #97), so the Court treats that as true. But the particulars of those restrictions are apparently in dispute. Rankin alleges that his injury substantially limited his ability to use his dominant hand, including for lifting and gripping onto things. (Doc. 14, #68). The doctors also told Rankin that an MRI and even surgery might be required. (*Id.*).

How Rogue reacted to this information is at the center of this case. Rankin claims that Rogue was aware of his limitations and his need for altered work duties. (*Id.*). It seems that Rankin was out of commission for a brief period. (*See id.* at #68–69). But he claims that Rogue's in-house counsel contacted his physicians, trying to alter the ordered restrictions so Rankin could come back to work. (*Id.* at #68). And when he did return, instead of accommodating his needs, Rogue "repeatedly assigned tasks that exceeded or pushed his [now modified] medical limitations." (*Id.* at #69). This included "heavy lifting" as well as "production-rate demands inconsistent with his restrictions." (*Id.*).

Beyond these difficulties, Rankin alleges various instances of mistreatment and retaliation for his requests. For example, he alleges that, when Rogue learned that Rankin might need surgery, its representatives told him that if he needed surgery, they would "ask [him] to resign." (*Id.* at #68). And when Rankin complained about being pushed too far on his return he was told to "let it go" as "[s]upervisors and shift leads responded with hostility, taunting, yelling, and dismissive conduct." (*Id.* at #69).

This all came to a head in early October, when Rogue "informed [Rankin] it could no longer accommodate his restrictions and ordered [him] not to report to work." (*Id.*). He states that Rogue placed him on unpaid leave. (*Id.*). But it seems that he returned soon after in some capacity, as "[o]n October 23, 2024," after he complained once again that he was in "severe pain" and needed "medical attention," Rogue fired him and "escorted him from the facility." (*Id.*).

Rankin says that Rogue's purported reason for this was his attendance issues. (*Id.* at #70). However, he disputes this—he says that many of the absences Rogue "counted as misconduct" were medically necessary. (*Id.* at #69). So according to him, putting aside his medically-excused absences, he had just one instance of "minor tardiness" while working for Rogue. (*Id.* at #70).

Beyond that, Rankin has one more bone to pick. He says that he did not receive the health insurance to which he was entitled, aggravating matters while he was injured. (*Id.*). Rogue's HR director, Amanda Simons, says in an affidavit that Rankin never made coverage elections in the 30-day window after he started. (Simons Decl., Doc. 23-2, #130–31). But Rankin alleges he communicated his elections to HR staff in-person. (Doc. 14, #70). According to him, Rogue did not follow through, and it never told him that it had failed to implement his elections or gave him a chance to make elections a second time. (*Id.*).

Aggrieved, Rankin filed a complaint with the Pittsburgh area office of the Equal Employment Opportunity Commission. (*See* Doc. 24-1, #149). The EEOC declined to pursue the matter itself, but all agree that it issued Rankin a Notice of Right to Sue (RTS) on August 20, 2025. (*Id.*). On November 18, 2025, Rankin began this lawsuit, or at least he attempted to do so. (*See* Doc. 1). He made his initial filing—his Motion for Leave to Proceed in forma pauperis (IFP) (Doc. 1) with the complaint attached (Doc. 1-1)—90 days after the EEOC sent the RTS. But his initial complaint did not hit the docket until December 3, 2025, 105 days after the RTS. (Doc. 6). More on that later.

Rankin sues under federal antidiscrimination laws that provide a private right of action, so this case arises under federal law. Rogue filed its Motion for Summary Judgment (Doc. 23) on March 16, 2023, and that matter is now fully briefed. (Doc. 24; Doc. 25). So the Court has jurisdiction, and the matter is ripe for decision.

## LEGAL STANDARD

A party can win summary judgment on an issue if they "show[] that there is no genuine dispute as to any material fact" and that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment the Court must keep in mind that "[t]he 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). But the non-moving party cannot defeat the motion merely by pointing to *any* factual dispute. Rather, "the requirement is that there be [a] genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (emphasis omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In short, the nonmoving party must present some "sufficient disagreement" that would require submission to a jury. *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In deciding whether they have made a sufficient showing for a reasonable jury to find for them, though,

the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). That is, "the court must afford all reasonable inferences … to the nonmoving party." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

## LAW & ANALYSIS

Rankin originally brought six claims against Rogue, but only five remain.[1] Three of the remaining claims clearly arise under the Americans with Disabilities Act: (1) disability discrimination, (2) failure to accommodate his disability, and (3) retaliation. (Doc. 14, #70–71); *see also* 42 U.S.C. §§ 12112, 12203. His fourth remaining claim is more ambiguous. He claims "retaliatory harassment" and a "hostile work environment," but does not specify a source of law. (Doc. 14, #71). His fifth and last remaining claim is for interference with employee benefits under § 510 of the Employee Retirement Income Security Act of 1974 (ERISA). (Doc. 14, #71–72); 29 U.S.C. § 1140. Rogue moves for summary judgment on all five of Rankin's claims. (Doc. 23, #109).

### A. Rankin's Disability Discrimination Claims

Rogue attacks Rankin's disability discrimination claims on two related grounds. First, it argues that Rankin's amended complaint is facially deficient because he did not plead that he had received the RTS or plead that his suit was

[1] Rankin and Rogue stipulated to the dismissal of a sixth claim, for retaliatory firing in violation of the public policy of Ohio. (*See* Doc. 22). A second defendant, Rogue's Associate General Counsel, Megan Kleinman, was named in the first complaint but not in the amended complaint. (*Compare* Doc. 6, #33, *with* Doc. 14, #67).

timely in light of it. (*Id.* at #114–15). Second, Rogue argues that the claims are time-barred because Rankin's initial complaint (Doc. 6) was not docketed until December 3, 2025, more than 90 days after the EEOC issued the RTS to him. (*Id.* at #115–16). The former argument is squarely foreclosed by precedent. A plaintiff need not plead the RTS so long as he has received it and apprised the Court and defendant of its existence. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 310 (6th Cir. 2000); *Davis v. Lincoln Crawford Care Ctr.*, No. 24-3910, 2025 WL 2944302, at *2 (6th Cir. Oct. 14, 2025)). The latter, however, requires a closer look.

For claims under the ADA's employment discrimination provisions, the operative statute, 42 U.S.C. § 12117(a), incorporates the enforcement scheme that appears in Title VII of the Civil Rights Act of 1964. Under that scheme, the EEOC generally has the power to sanction private actors for violating the ADA. 42 U.S.C. § 2000e-5(a). For an ordinary person to properly sue, they must satisfy certain preconditions. Relevant here, they first must file a "charge" with the EEOC, "alleging that an employer … has engaged in an unlawful employment practice," *id.* § 2000e-5(b), and they must do so within 180 days "after the alleged unlawful employment practice occurred," *id.* § 2000e-5(e)(1). The Commission then has 180 days to act. *Id.* § 2000e-5(f)(1). If it elects not to act on the charge, the EEOC must so advise the person who filed it. *Id.* Only then can "the person claiming to be aggrieved" bring a civil action, and they must bring it "within ninety days after" the EEOC gave them notice that it would not act unilaterally. *Id.* Generally, that 90-day period starts

running five days after the EEOC sends the RTS.[2] *Carter v. Hickory Healthcare, Inc.*, 905 F.3d 963, 969 (6th Cir. 2018).

Rankin received that notice on August 20, 2025. (Doc. 24-1). Ninety days later—still within the deadline—he filed a complaint and a Motion for Leave to Proceed in forma pauperis (IFP). (Doc. 1). Ordinarily, that would be enough. The complaint is deemed timely in those circumstances so long as "the clerk's office takes possession of the complaint and the application [to proceed IFP] is granted." *Truitt v. Cnty. of Wayne*, 148 F.3d 644, 647 (6th Cir. 1998) (quoting *Dean v. Veterans Admin. Reg'l Off.*, 943 F.2d 667, 671 (6th Cir. 1991)). That is because "the ninety-day period should be tolled during the pendency of a plaintiff's IFP application." *Id.* So, if the application is ultimately granted and the complaint filed, all the time after the IFP application would be tolled. When the application is denied, on the other hand, the clock starts running upon the Court's decision denying IFP status and does not stop until the plaintiff pays up. *Id.* at 648.

The events here fall somewhere in the gray area between those two possibilities. Rankin timely filed his IFP application, and ultimately the Court granted him that status. (Doc. 5). So far, so good. The problem is that he had to file *two* such motions because he did not include sufficient information for the Court to

[2] This may strike the reader as surprising. What makes it perhaps less surprising is that this rule sprung up before the EEOC began notifying people of action on their charge through email. *See Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 & n.9 (6th Cir. 2000). Because Rankin filed his IFP motion on time even without this five-day bonus, the Court does not pursue the possibility that *Graham-Humphreys*' holding (which applied a presumption of actual notice based on how long postal delivery usually takes, *id.*) does not apply to a notice sent over email.

rule on his first. (*See* Deficiency Ord., Doc. 3; Doc. 4 (second motion)). The Court advised him of that deficiency by an order issued on November 20, 2025. (Doc. 3). That order did not deny his original motion, but instead merely told him to submit a revised version of it. (*Id.*). Rankin did so on December 1, 2025. (Doc. 4). So, the Court ultimately denied Rankin's original IFP motion, but only because at the same time it did so, it granted his second IFP motion. (Doc. 5, #29). As the order put it, the second IFP motion rendered his original IFP motion moot. (Doc. 5, #29).

Against that backdrop, Rogue's argument tasks the Court with answering this basic question: Did the clock start back up in the interim between the Court's November 20, 2025, deficiency order and Rankin's December 1, 2025, IFP application? The Court concludes that it did not, making Rankin's complaint timely under § 2000e-5(f)(1).

Where the Court does not deny an IFP application on the "merits," but instead orders the plaintiff to provide more information, the initial application remains pending for all intents and purposes. At the very least, that is the case where, as here, the plaintiff files the revised motion promptly and within the time the Court's order specified.[3] (*Compare* Doc. 3, #24 (ordering Rankin to submit a revised motion within 10 days of November 20, 2025), *with* Doc. 4 (Rankin's December 1, 2025, revised motion, submitted the first business day after the expiration of the ten-day deadline)).

---

[3] It is a separate question whether the result here would extend to a situation where a court actually *denies* a first IFP application but offers the plaintiff a second bite at the apple within a specified timeframe, which the plaintiff meets. But it is not a question that the Court needs to address here.

Admittedly, the few cases to consider this issue have produced mixed results. One court, for example, held that the clock runs during this interim period, though only after the plaintiff has received constructive notice of the court's conclusion that the first motion was deficient. *Williams v. Stake*, 75 F. Supp. 3d 185, 188–89 (D.D.C. 2014). But another concluded, as the Court now does, that tolling extends through the period a court gives the plaintiff to correct an initially slap-dash IFP application. *LeClair v. Wells Fargo Bank Iowa, N.A.*, 291 F. Supp. 2d 873, 878–79 (S.D. Iowa 2003). At least on the facts here, where the Court did not deny the motion and instead ordered a revision within a certain timeframe—a timeframe that the plaintiff met—tolling through the time the Court rules on the supplemental IFP motion (and formally denies the original IFP motion) is warranted. Thus, Rankin's ADA claims were timely.[4]

## B. Rankin's ERISA Claim

Next up is Rankin's claim under ERISA that Rogue interfered with his employment benefits by failing to process his insurance elections. (Doc. 14, #71–72). To attack this claim, Rogue argues that Rankin has not offered sufficient evidence of essential elements of the claim, which typically means summary judgment is appropriate. *See Celotex*, 477 U.S. at 322–23. Specifically, Rogue argues that Rankin

[4] There is one loose end still. Recall that Rogue purports to move for judgment on Rankin's hostile work environment claim as if it were an ADA claim. (*See* Doc. 23, #113–17). But Rankin's amended complaint does not identify a particular source of law for that claim. (Doc. 14, #71). If it is an ADA claim, Rogue's motion, which is based solely on the timeliness issue, fails for the reasons noted above. If it arises under some other law, then the timeliness argument does not apply. Either way, Rogue's motion for summary judgment on that claim fails. But the Court flags the potential need to address the confusion about the law underlying this claim going forward.

has not created a triable issue on the "purpose of interfering" with employee rights element of a § 510 claim. (Doc. 23, #116 (quoting *Pennington v. W. Atlas, Inc.*, 202 F.3d 902, 906 (6th Cir. 2000))). That may turn out to be correct, but the Court cannot grant Rogue's motion as to this claim because there hasn't yet been discovery on this claim, making summary judgment premature.

Courts must "afford [] parties adequate time for discovery" before entering summary judgment. *Plott v. Gen. Mot. Corp., Packard Elec. Div.*, 71 F.3d 1190, 1195 (6th Cir. 1995). Rule 56 provides the mechanism to do that: courts can (and in the right circumstances, must) deny summary judgment on the grounds that granting it would be premature. Fed. R. Civ. P. 56(d). The rule's text would seem to present a high bar, however: the Court may defer or deny judgment if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." *Id.* Rankin, while he has submitted a declaration of sorts, does not include within it any alleged reasons why he cannot develop sufficient evidence to reach a jury on his ERISA claim. (Doc. 24, #146–48). Rather, he offers his reasons in the body of his argument opposing Rogue's motion. There, Rankin points out that he "has not yet had the benefit of discovery." (*Id.* at #146). And he argues that access to things like "[i]nternal communications, policies, and training materials" would help him develop the claim but for the problem that they "remain within [Rogue's] control." (*Id.*).

As a general matter, "filing an affidavit that complies with Rule 56(d) is essential." *Unan v. Lyon*, 853 F.3d 279, 292 (6th Cir. 2017). On the other hand, courts

are more forgiving when "a party has clearly explained its need for more discovery on a particular topic … prior to or contemporaneously with the motion for summary judgment." *Id.* at 293 (quoting *United States v. Rohner*, 634 F. App'x 495, 504 (6th Cir. 2015)). A formal affidavit or motion to compel discovery, then, is unnecessary if it would serve only to "preserve the matter" because the underlying argument was made elsewhere. *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 628 (6th Cir. 2002).

So move onto the heart of the matter—whether, affidavit or not, Rankin's reasons why he cannot offer facts at this point suffice to defeat Rogue's motion. To successfully defeat summary judgment on prematurity grounds, a party usually must offer material that explains why the five non-exclusive factors outlined in *Plott* support them.[5] But there's no need to go down that road here. That is because the Sixth Circuit has held that, at least where there's discovery to be had, it is "a misuse" of Rule 56 to grant summary judgment "absent *any* opportunity for discovery." *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231 (6th Cir. 1994).

That's the case here. The Court stayed discovery in this case on February 17, 2026, pending "resolution of [Rogue's] forthcoming motion regarding jurisdiction."[6] (Prelim. Pretrial Ord., Doc. 21, #106). So Rankin, who again is proceeding pro se, has not had the benefit of any discovery. And Rogue's attack on Rankin's claim—that he

[5] Those are: (1) "when the appellant learned of the issue that is the subject of the desired discovery," (2) "whether the desired discovery would have changed the ruling below," (3) "how long the discovery period had lasted," (4) "whether the [nonmovant] was dilatory in its discovery efforts," and (5) "whether the [movant] was responsive to discovery requests." 71 F.3d at 1196–97.

[6] That would be this motion. (*See* Doc. 21, #106).

never properly enrolled in benefits—requires at least some discovery. Rankin argues that he "reasonably relied" on Rogue's human resources staff, who led him to believe that "his benefits elections had been completed." (Doc. 24, #145; *see also id.* at #147 (asserting that Rankin "attempted to enroll in employee benefits," "communicated with Human Resources regarding my elections," and "believed [his] benefits elections had been properly completed"). Whether that is so, and whether Rogue's non-enrollment of Rankin was motivated by a purpose of interfering with his rights, will depend, as Rankin readily admits, on what Rogue's "[i]nternal communications, policies, and training materials" reveal. (*Id.* at #146). But, absent Rankin having at least some opportunity to gather that evidence, the Court is simply not in a position to dispose of the ERISA claim on the merits now.

## CONCLUSION

For the above stated reasons, the Court **DENIES** Rogue's Motion for Summary Judgment (Doc. 23). The denial, however, is **WITHOUT PREJUDICE** to Rogue's right to renew its argument above as to the ERISA claim once adequate discovery has occurred.

**SO ORDERED.**

November 3, 2026
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**